Argued June 30, reversed and remanded September 14, objections to cost bill allowed in part September 20, 1927.

## A. K. PECK *v.* COOS BAY TIMES PUBLISHING CO. ET AL.

### (259 Pac. 307.)

**Libel and Slander—Where Articles are not Libelous Per Se, Special Damages must be Alleged and Proven.**

1. Where articles alleged to be libelous are not actionable *per se,* special damages must be alleged and proven.

**Libel and Slander—Where Article is Libelous Per Se, It is Unnecessary to Point Out With Particularity Manner in Which Plaintiff was Damaged.**

2. Where libelous article is actionable *per se,* it is not necessary to allege special damages and point out with particularity in what manner plaintiff was damaged.

**Libel and Slander—"Libel" is "Actionable Per Se" When Court can Presume Defamatory Words will Tend to Disgrace Plaintiff or Expose Him to Public Hatred, Contempt, Ridicule or Ostracism.**

3. Defamatory words to be libelous *per se* must be of such nature that the court can presume they will tend to disgrace and degrade plaintiff, hold him up to public hatred, contempt or ridicule, or cause him to be shunned and avoided, and that as a matter of law damages will naturally result from the publication.

**Libel and Slander—Whether Article is Libelous Per Se is for the Court.**

4. Whether an article is libelous *per se* is matter of law for the court to determine.

---

1.  See 17 R. C. L. 431.
2.  See 17 R. C. L. 264.

**Libel and Slander—In Determining Whether Article is Libelous Per Se, Court must Look to General Purport and not to Isolated Portions.**

5. In determining whether or not an article is libelous *per se*, the court must look to its general purport and intent and not to isolated sentences.

**Libel and Slander—In Alleged Libelous Publication Words are to be Construed According to Ordinary Meaning.**

6. In determining whether an article is libelous *per se*, words are to be construed according to the ordinary acceptance and meaning which would be given them by a reader of ordinary intelligence.

**Libel and Slander—Where Words of Alleged Libel are Unambiguous, Whether Article is Libelous Per Se must be Determined Without Reference to Innuendo.**

7. In determining whether an alleged libelous publication is libelous per se, the question must be determined without reference to innuendo since, if not libelous *per se*, from the face of the writing, it cannot be made so by innuendo.

**Libel and Slander—In Libel Action Where No Special Damages are Pleaded, Pleaded Innuendo will be Rejected as Surplusage.**

8. In a libel action where the complaint does not allege special damages, pleading of innuendo will be rejected as surplusage, since if the article is not libelous *per se* on its face it cannot be made so by innuendo.

**Libel and Slander—In Determining Sufficiency of Pleading in Libel Action, Falsity of Publication and Malice will be Assumed.**

9. In determining whether the pleading in an action for libel is sufficient it will be assumed that the defendants confess the falsity of the publication and concede that it was made maliciously.

**Libel and Slander—Article Charging Plaintiff With Being Double-Crosser in Politics Held Libelous Per Se.**

10. Newspaper publication charging plaintiff with being a political double-crosser *held* to be libelous *per se.*

**Libel and Slander—Article Charging Plaintiff Committed Premeditated and Malicious Assault Held Libelous Per Se.**

11. Newspaper publication charging that plaintiff attorney committed a misdemeanor, namely, a premeditated and vicious assault, *held* to be libelous *per se.*

**Libel and Slander—To Constitute Libel Charge of Crime Need not Follow Technical Terms of Indictment.**

12. To constitute a libelous publication it is not necessary that the charge of premeditated and vicious assault follow the technical terms of an indictment.

---

5. See 17 R. C. L. 313.

Libel and Slander—Newspaper Held to have Right to Make Fair Comment and Criticism Without Malice on Plaintiff's Alleged Unreliability in Politics, Affiliation With Ku Klux Klan, When of Public Concern, and to Criticise Advocacy of Doctrines Deemed Harmful.

13. Newspaper *held* to have right to make fair comment and criticism, if done in good faith and without malice, upon plaintiff's alleged unreliability in political matters, his affiliation with Ku Klux Klan, when it affected matters of public concern, and to criticise his advocacy of doctrines which it deemed fallacious and harmful to public welfare.

Libel and Slander—Newspaper cannot Injure Person's Good Name Under Guise of Qualified Privilege.

14. Newspaper under the guise of qualified privilege cannot defame a person or injure his good name.

Libel and Slander—In Libel Action Whether Newspaper Publication was Qualifiedly Privileged was Question for Court.

15. In an action for libel the question of whether newspaper publications were qualifiedly privileged *held* a matter for the court to determine.

Libel and Slander—In Libel Action, Failure to Instruct Jury That Newspaper's Statements Concerning Plaintiff's Political Activities and Alleged Affiliation With Ku Klux Klan were Privileged Unless Made Maliciously Held Error.

16. In action for libel, failure to instruct the jury as a matter of law that statements in newspaper publications concerning plaintiff's political activities and his alleged affiliation with Ku Klux Klan came within doctrine of qualified privilege unless they were made maliciously *held* error.

Libel and Slander—Newspaper Held not to have Privilege of Charging That Plaintiff Committed Assault or That He was Double-crosser.

17. In action for libel, newspaper *held* not to have had a qualified privilege of charging that plaintiff had committed a premeditated and vicious assault, or that he was a double-crosser in politics.

Libel and Slander—Truth Held Only Defense to Charge of Commission of Misdemeanor.

18. In action for libel, truth *held* the only defense to a charge that plaintiff had committed a premeditated and vicious assault.

Libel and Slander—In Libel Action, Refusal to Advise Jury as to What was Privileged and What was not, in Newspaper Publications, Held Error.

19. In an action against a newspaper for libel refusal to advise the jury as to which portion of the newspaper publications were

privileged and which were not, an¹ leaving these matters to the jury, *held* error.

**Libel and Slander—In Libel Action, Whether Defendants in Exercising Qualified Privilege of Newspaper were Actuated by Malice Held for Jury.**

20.   In an action against a newspaper and its editor for libel, whether the defendants were actuated by malice in the exercise of a qualified privilege *held* a question of fact for the jury.

**Libel and Slander—Trial—Publications Other Than Those on Which Libel Action is Based Should be Considered Only in Determining Malice, and Refusal to so Instruct Held Error in View of Instruction Given.**

21.   Publications other than those on which libel action is based should be considered only in determining malice, and hence refusal to instruct to that effect was *held* error, especially in view of an instruction that if the defendants knowingly published false statements, the jury should find the publication was made maliciously.

**Libel and Slander—Articles Other Than Alleged Libelous Articles Held Admissible on Question of Malice.**

22.   In action against newspaper for libel, it was proper to receive in evidence other publications than those on which the action was based, since they were relevant on the question of malice.

**Libel and Slander—In Action for Libel, Plaintiff Could not Recover upon Publication Other Than That Set Forth in Complaint.**

23.   In an action for libel, the plaintiff could not recover upon the publication of any article other than those which were set forth in the complaint and upon which it had based the action.

**Evidence—In Libel Action, Permitting Plaintiff to Give His Interpretation of Alleged Libelous Articles Held Error.**

24.   In action against newspaper for libel, it was error for the court to permit the plaintiff to give his interpretation of the words in the alleged libelous articles, and defendant's motion to strike out such testimony should have been granted.

**Libel and Slander—Refusal to Instruct in Libel Trial That Innuendoes Could not Extend Meaning of Words Beyond Natural Import Held Error.**

25.   In an action against a newspaper for libel, failure to give requested instruction that innuendos could not extend the meaning of words asserted to be libelous beyond their natural import, but could only serve to explain some matter already expressed, *held* error.

**Libel and Slander—Articles Provoking Alleged Libels Held Admissible on Malice Issue and in Mitigation of Damages.**

26.   In action against newspaper for libel, publications in newspaper of which plaintiff was a director which were claimed to have

provoked the alleged libels *held* admissible on the question of malice and in mitigation of damages.

Libel and Slander, 36 **C. J.**, p. 1143, n. 44, p. 1151, n. 84, p. 1153, n. 31, p. 1155, n. 61, p. 1163, n. 19, p. 1164, n. 25, p. 1168, n. 83 New, p. 1170, n. 29, p. 1192, n. 26, p. 1193, n. 28, p. 1199, n. 60, p. 1248, n. 66 New, p. 1282, n. 39; 37 **C. J.**, p. 24, n. 29, p. 25, n. 31, 33, p. 35, n. 14, 19, p. 79, n. 32, p. 80, n. 34, p. 91, n. 35, p. 101, n. 29, 33, p. 105, n. 82, p. 106, n. 1, p. 107, n. 3, p. 109, n. 31, p. 110, n. 40, 48, p. 111, n. 50, 51, 61.

From Coos: Walter H. Evans, Judge.

Department 2.

Reversed and Remanded.

For appellants there was a brief over the name of *Messrs. Goss & Murphy*, with oral arguments by *Mr. John D. Goss* and *Mr. H. S. Murphy.*

For respondent there was a brief over the names of *Messrs. Peck & Brand, Mr. J. F. Anderson* and *Mr. W. T. Stoll*, with oral arguments by *Mr. A. K. Peck* and *Mr. James T. Brand.*

BELT, J.—Plaintiff, who is a lawyer and has been engaged in the practice of his profession at Marshfield, Oregon, for many years, commenced this action in libel to recover damages alleged to have been sustained on account of the publication by the defendants, Coos Bay Times Publishing Co. and its manager and editor, M. C. Maloney, of two articles which are set forth in the complaint.

It is alleged that on May 28, 1923, the following article, which is the basis of the first cause of action, was published:

"A BOUQUET OF BITTER (SWEET) PEAS.

"Peck and Parker and Perkins are peeved. These alleged promoters of political prestige and other prejudices propose to make the whole Pacific coast

reel and rock with their roars.  Because Governor Pierce refused to do the bidding of K. K.—we mean A. K.—Peck, who seeks to be political dictator of Coos County, the very air is made vibrant with their vitriolic vaporings.  These royal sons of the invisible regency threaten revolution and rebellion because their Peck-sniffian leader, He-Who-Must-Be-Obeyed, is refused recognition.

"The Times understands from excellent authority that J. E. Norton stood an excellent chance of securing the appointment as highway commissioner, until the daily news came out with its front page pronunciamento  telling Governor Pierce that he had to take certain action and threatening secession of the entire (300(?) stockholders if he didn't.  Then the governor manifested a little of the 100 per cent American independence that Peck puffs about and refused to accept the dictatorship of Peck, the would-be Caesar of Coos. The result is another thunderbolt from the terrible trio of terrorists.  The front page reeks with red threats of rebellion.  We do not know whether the K. in K. K.—we mean A. K. Peck, stands for King, Kleagle or Kounselor, but anyway, all his subjects in southwestern Oregon are going to secede.  Governor Pierce is going to feel the power of their vengeance.  The coronet—we mean the coroner department of the Klose Korporation, is already preparing to sit on the political corpse of the governor.  Peck, Parker and Perkins are to administer the poison pen. A. B. Gidley has the contract to grunt and put up a front.  Lionel Gordon will slap the governor on the wrist, so there, now, and Wilson, Fred Wilson, the go get 'em coroner and burial director of the Klose Korporation, he will care for the political corpse.

"It is not known whether the seceders will form a separate state or a new empire.  But something must be done to soothe the stockholders and prove the power and prestige of Peck, which seems to be sadly on the wane.  He has failed now in several of his political promotions sKeams from governor to postmaster.

"And why, forsooth, this tempest in a teapot by these blood-sweating behemoths of political bunKum?

"And who, pray, are these white-robed angels of purity who prate prettily of political gratitude?

"Why should political ingrates and renegade republicans who repudiated their party and made a democrat governor of Oregon howl about political gratitude? Why should these political double-crossers yelp with pain when they are given a dose of their own medicine. K. K.—we mean A. K. Peck, who has been given honors by the republican party, did his best to defeat it in the last campaign, and now because a democratic governor he helped to elect appoints a democrat to office, pecK and his associates are peeved. The P's—Peck, Parker and Perkins—are bitter; the G's—Gidley and Gordon—are grouchy, and W—Wilson—he's doubled up with colic because PecK has a pain.

"The pity of it all is that Coos County should be made to suffer in recognition and prestige because of the pecksniffian policy of Peck and his associates.

"There will be few, even among Secretary Peck's stockholders, who will regard his failing political power as a tragedy. When the double-crosser is double-crossed, even when he bears a fiery cross, it seems only a fitting fate. Commercializing Christianity, promoting passion and prejudice, and making hate the cornerstone of a new cult may temporarily flourish, but the world must be made over if vices are to be transformed into virtues and political mountebanks are to become monarchs of a new invisible empire."

Innuendo was pleaded to show the sense in which plaintiff believed the above language was used and was understood by those who read the article.

For the second cause of action it is alleged that on May 29, 1923, the second article was published of and concerning plaintiff as follows:

## "THE HARVEST OF HATE.

"The propaganda of prejudice, passion and hate which is being broadcasted by K. K. Peck, or rather A. K. Peck, secretary of the Daily News Publishing Co. and his associates found its full flower and fruition and its legitimate expression in the premeditated and vicious assault of Lionel Gordon, his brother, and others on Dan E. Maloney this morning.

"Since the dawn of time and until time shall be no more, there is only one inevitable result to fanning flames of hate and that result is always violence. The violence which found its expression in the assault made by Peck and Gordon, follows as certain as night follows day. The prejudices and passion engendered by unreasoning hate nurtured for any purpose.

"Peck has sought to promote his political fortunes and prestige by appeals to the basest of all human emotions, that of hate. He has in some manner succeeded in surrounding himself with others who ignorantly or indifferently accept his poisonous propaganda. The attacks made were the direct result of this attitude of bigotry. Whether they followed a program intended to strengthen a belief in his sincerity among some of his misguided followers or merely the flowering of his own carefully promoted passions makes no difference. The results are the same and are inevitable.

"If Peck and his henchmen think they can silence The Times by assaults on its editors or by an attempted reign of terrorism, they are as much in error as they are in the propaganda which they are spreading.

"The Coos Bay Times will continue in the future as it has in the past giving the news without fear or favor, and striking error where and when it finds it.

"No community and no nation has ever grown to greatness on hate, and never will until human nature is remade.

"The temporary growth of these cults is only fleeting and passes as all things evil must pass."

Innuendo was also pleaded with reference to the above publication. After alleging that these articles injured plaintiff in that they brought him into public hatred, contempt and ridicule, general damages for $5,000 on each cause was demanded.

After demurrer to the complaint was overruled, the defendants answered in substance admitting the publication as alleged but denying any intent to injure plaintiff and alleging affirmatively by way of innuendo the sense in which certain words of the articles were used and were understood by the public. As to the first cause of action, defendants further plead that the publication "was true in the sense in which the words were used," and rely upon the defense of qualified privilege and that of fair comment and criticism.

Concerning the second cause of action, defendants aver that the article which is the basis thereof is true and also that the same was published under the rule of fair comment and criticism. Innuendo is also pleaded giving defendants' interpretation of the article published. In mitigation of damages and as a provocation for the publication of the second article entitled "The Harvest of Hate," it is alleged that immediately prior thereto the plaintiff assaulted the defendant, M. C. Maloney.

It is difficult from an examination of the abstract of record to ascertain with any degree of certainty what are the issues under the pleadings, but we think the above is a fair statement of the same. If we have erred in this respect the moral is obvious.

The cause was submitted to a jury and a verdict returned in favor of plaintiff for $1,500, it being therein specifically stated that $500 was upon the first cause of action and $1,000 upon the second.

Defendants base their appeal upon 79 assignments of error. We will consider only those discussed in the briefs.

1, 2. Does the complaint state a cause of action? Special damages are not pleaded. Plaintiff relies upon general damages that are presumed to follow from the publication of articles libelous *per se.* Where articles are not actionable *per se* special damages must be alleged and proven: *Barnett* v. *Phelps,* 97 Or. 242 (191 Pac. 502, 11 A. L. R. 663); *Clark* v. *Morrison,* 80 Or. 240 (156 Pac. 429); *Nichols* v. *Daily Reporter Co.,* 30 Utah, 74 (83 Pac. 573, 116 Am. St. Rep. 796, and note, 8 Ann. Cas. 841, 3 L. R. A. (N. S.) 339); *Graham* v. *Star Publishing Co.,* 133 Wash. 387 (233 Pac. 625); 17 R. C. L. 391; 25 Cyc. 454. Not having pleaded special damages, whether plaintiff has stated a cause of action depends upon whether the articles or either of them are libelous *per se: Jimeno* v. *Commonwealth Home Builders,* 47 Cal. App. 660 (191 Pac. 64); 37 C. J. 35. If such were actionable *per se,* it was not necessary to allege special damages and to point out with particularity in what manner plaintiff was damaged.

3. *Willetts* v. *Scudder,* 72 Or. 535 (144 Pac. 87), thus defines libel:

"A libel is a malicious defamation, made public either by printing, painting, writing, signs or pictures, tending to blacken the memory of one who is dead, or the reputation of one who is living, and to expose him to public hatred, contempt or ridicule."

"Libels affecting the character of private persons may be classified according to their objects: (1) libels which impute to a person the commission of a crime; (2) libels which have a tendency to injure him in his office, profession, calling or trade; (3) libels which hold him up to scorn and ridicule, and to feelings of

122 Or.—27

contempt or execration, impair him in the enjoyment of general society, and injure those imperfect rights of friendly intercourse and mutual benevolence which man has with respect to man." Newell on Slander and Libel (4 ed.), § 8.

When are libels actionable *per se?* It is stated in 36 C. J. 1164:

"But defamatory words to be libelous *per se* must be of such a nature that the court can presume as a matter of law that they will tend to disgrace and degrade the party or hold him up to public hatred, contempt or ridicule, or cause him to be shunned and avoided."

4–7. Whether an article is libelous *per se* is a matter of law for the court to determine (*Woolley* v. *Plaindealer Publishing Co.,* 47 Or. 619 (84 Pac. 473, 5 L. R. A. (N. S.) 498); *State* v. *Conklin,* 47 Or. 509 (84 Pac. 482), and in so doing it must look to the general purport and intent of the article published and not to isolated sentences. Words are to be construed in their ordinary acceptance and meaning. The test is: What sense will be given to them by a reader of ordinary intelligence? Will the natural and proximate consequence be to injure the person about whom they have been published? Will such words tend to bring a person into public hatred, contempt or ridicule? If the words are plain and unambiguous and susceptible of but one meaning, it is the duty of the court to determine from the face of the writing, without reference to innuendo, whether the same are actionable *per se.* If the article is not of such nature and character that the court can say as a matter of law that damages will be presumed as a consequence of its publication, then it cannot be made so by innuendo. As stated in *Cole* v. *Neustadter,* 22 Or. 191 (29 Pac. 550):

"It (innuendo) may apply what is already expressed but cannot add to, enlarge or change the sense of the previous words."

8. In the instant case, the innuendo pleaded may well be rejected as surplusage: *Morrison* v. *Smith*, 177 N. Y. 366 (69 N. E. 725); *Gustin* v. *Evening Press Co.*, 172 Mich. 311 (137 N. W. 62, Ann. Cas. 1914D, 95); 17 R. C. L. 397. Plaintiff predicated this action upon articles which he contends are libelous *per se.* If they are not so, no cause of action is stated.

9, 10. In the light of the legal principles above stated let us examine the article, "A Bouquet of Bitter (Sweet) Peas," which is the basis of the first cause of action. It is to be borne in mind that, for the purpose of determining whether the pleading is sufficient, the defendants confess the falsity of the publication in question and concede that it was made maliciously. It is to be understood that what we say at this juncture has no application to the defense of qualified privilege or that of fair comment and criticism. We believe that the natural tendency of the above article would be to cause a stranger of ordinary intelligence—one not actuated by prejudice—to form an opinion of the plaintiff Peck that would operate to his injury. It is plain that defendants intended to hold the plaintiff up to public ridicule and contempt. To charge a man with being a "double-crosser" ° carries with it the implication that he is deceitful and not loyal to those who have been his friends. It is true that this reference was made to plaintiff concerning his political activities, but it is none the less objectionable, since deceit, hypocrisy and disloyalty, even in politics, are looked upon with disfavor by all right thinking men. Plaintiff is not charged with the commission of a crime nor is there

any attempt to injure him in his profession, but the article comes within the third classification of libels as above stated; viz., that of holding him up to public scorn, contempt and ridicule.

11, 12. We are also of the opinion that the second article entitled "The Harvest of Hate" is actionable *per se,* and much of what has heretofore been said is applicable thereto. It is particularly objectionable in that it charges plaintiff with having committed a premeditated and vicious assault. While the language used does not follow the technical terms of an indictment—and to constitute libel it is not necessary so to do—it is plain that plaintiff is charged with having committed a crime. It is immaterial that it is only a misdemeanor. See cases cited in exhaustive note to *Nichols* v. *Daily Reporter Co., supra,* as reported in 116 Am. St. Rep. 796. We conclude that the complaint, especially after verdict, is sufficient.

13, 14. "Coos Bay Times," as a newspaper, had the right to make fair comment and criticism upon plaintiff's alleged unreliability in political matters affecting public interest and it was also within its province to criticise his advocacy of doctrines which it deemed to be fallacious and inimical to the public welfare. The greater portion of the articles constitute an attack upon the Ku Klux Klan and upon Peck by reason of his alleged affiliation with such organization. While Peck was not a candidate for office nor did he occupy a public position, it appears from the record that he was a leader in political activities and, therefore, invited more or less criticism from those who were not his supporters. When a man enters the political arena, even though not a candidate, he must not be too sensitive about criticism. There are generally blows to receive as well as to give. While a

newspaper, under the guise of qualified privilege, has no right to defame a person or to injure that which in his most valuable property right—a good name, it is no longer, in reference to matters of public interest, obliged to speak with bated breath. Certainly the defendant newspaper had a right to express its opinion concerning the activities of the Ku Klux Klan, and plaintiff's affiliation with it, when they affected matters of public concern, if the publication was made in good faith and without malice. As stated in 17 R. C. L. 352:

"Matters of public interest and concern are legitimate subjects of criticism, and everyone has a right to comment thereon as long as he does so fairly and with an honest purpose. Such comments or criticisms are not libelous, however severe in their terms, unless they are written maliciously."

That publications respecting political affairs are in a measure privileged is recognized by the overwhelming weight of authority: 17 R. C. L. 353, and numerous cases cited in support of the text. In Newell on Slander and Libel (4 ed.), 47, it is said:

"But written abuse relating solely to political views or arguments on questions of public interest and which do not attack the character of a person nor impute immorality nor violation of law are not actionable *per se.*"

Plaintiff apparently recognized this doctrine for, in response to the question: "In any event you do not consider it libelous to accuse a man of being a member of the Ku Klux Klan?" he answered, "Well, I do not know that I do; * * ."

15-20. There is no dispute about the facts surrounding the publication of the articles in question and, therefore, whether they were qualifiedly privi-

leged was a matter for the court to determine: *Ivie* v. *Minton,* 75 Or. 483 (147 Pac. 395). The court should have instructed the jury as a matter of law that that portion of the articles concerning plaintiff's political activities and his alleged affiliation with the Ku Klux Klan came within the doctrine of qualified privilege and that there could be no recovery by reason thereof unless it were established by the greater weight of the evidence that defendants in the exercise of such privilege were not acting in good faith but with actual malice. However, the defense of qualified privilege or that of fair comment and criticism avails nothing relative to the charge that plaintiff committed a premeditated and vicious assault or that he was a "double-crosser." Privilege ends where defamation begins. Relative to charge of commission of crime, truth was the only defense. It was not pleaded as a defense to the first publication. The trial court, although requested so to do, did not advise the jury as to what was privileged and what was not, but left those matters for its determination. This was error. As to whether defendants were actuated by malice in the exercise of a qualified privilege was a question of fact for the jury.

21. Other articles than those upon which this action is based, published by the defendant newspaper concerning plaintiff, were received in evidence. In reference to those articles, defendants requested the court to give the following instruction, which was refused:

"Plaintiff complains of only two articles of publication as being libelous, one being entitled 'A Bouquet of Bitter Sweet Peas,' the other, 'The Harvest of Hate,' and those are the only publications you may consider as constituting libel. Any other publication or article printed by defendants are to be considered by you only as bearing on the question of malice."

This instruction is sound and should have been given by the trial court. Its failure to do so was particularly objectionable in view of the instruction which it did give as follows:

" * * if you shall find that the defendants published any libelous statement of and concerning the plaintiff, with knowledge that such statement was false, then you should find that the publication by the defendants was made maliciously."

22, 23. It was proper to receive the articles in evidence, as the same were entitled to consideration by the jury relative to the question of malice, but it is obvious that the plaintiff could not recover upon the publication of any article other than those set forth in the complaint: 17 R. C. L. 410; 37 C. J. 79, 111.

24. It was error for the court to permit the plaintiff as a witness to give his interpretation of the words in the libelous articles and explain the sense in which, in his opinion, they were used. Defendants' motion to strike that portion of the testimony should have been allowed. As heretofore stated, the articles were, as a matter of law, either actionable *per se* or not. Their legal effect could not be changed by innuendo nor by testimony purporting to enlarge or extend the scope of their meaning.

25. Defendants' following requested instruction should have been given:

"I instruct you that innuendos cannot extend the meaning of words asserted to be libelous beyond their natural import, and can only serve to explain some matter already expressed."

26. It is the theory of defendants that the articles in question were published in answer to others appearing in the "Southwestern Oregon Daily News," a newspaper published in the City of Marshfield by a

corporation of which the plaintiff Peck is a director. The first of these is entitled, "An Open letter to Governor Pierce," and the second, an editorial, "Political Ingratitude," denouncing ex-Governor Pierce for his failure to appoint Mr. Norton as a member of the State Highway Commission. These articles were admissible in evidence relative to the question of malice and in mitigation of damages.

It is not deemed necessary to discuss other assignments of error. The cause is reversed and remanded for a new trial.    Reversed and Remanded.

Bean and McBride, JJ., concur.