Paul MARTIN and Verla Martin, husband and wife, Plaintiffs,

v.

REYNOLDS METALS COMPANY, a corporation, Defendant.

Civ. No. 61–545.

United States District Court
D. Oregon.

Dec. 11, 1963.

Nels Peterson, Peterson, Lent & Paulson, Portland, Or., for plaintiffs.

Fredric A. Yerke, Jr., King, Miller, Anderson, Nash & Yerke, Portland, Or., for defendant.

EAST, District Judge.

The plaintiffs (Martin) are the owners of real property referred to as the Troutdale Ranch, located just east of the Sandy River adjacent to its confluence with the Columbia River in Multnomah County, Oregon, upon which they have during the past years operated a livestock grazing ranch.

The defendant corporation (Reynolds) is a Delaware corporation with its principal place of business in Virginia and having extensive and wide-spread general public-consumer business. Reynolds is authorized to engage in its business in Oregon, and has been for some years past and is now operating an alumina reduction plant upon its property located just westerly of the Sandy River and in the general vicinity of Martin's Troutdale Ranch. Martin's action herein seeks to recover from Reynolds alleged trespass general and punitive damage sustained as the result of the escapement of large quantities of fluorides from Reynolds' alumina reduction plant which in turn settled upon the Troutdale Ranch and rendered the forage and water thereon "contaminated and unfit for ingestion by cattle" injuring the livestock grazing on the Ranch and causing the loss of the use of the land for grazing purposes.

Reynolds denies actionable trespass on its part and affirmatively asserts that it has installed efficient fume collecting systems in its plant and that if trespass was committed, Martin's claims thereunder are barred by the statute of limitations, and further that the claims are barred by prior recoveries and adjudications of judicial claims asserted by the Martins over the past dozen or so years.

Thus is presented the stage and backdrop of Reynolds' counterclaim presented in these proceedings against Martin.

Reynolds' counterclaim contains two counts—the first based upon libel and the second upon tort, referred to as "injurious falsehood" and malicious interference with Reynolds' business relations, all arising out of the erection and maintenance by Martin upon the Ranch of a large billboard-type sign which is in plain view of westbound travelers of U. S. Highway 30 expressway as the traffic passes through the Troutdale Ranch and approaches Reynolds' alumina reduction plant lying in view to the northwest, and reads as follows:

"THIS RANCH IS CONTAMINATED
831 Cattle Killed in past six years
FLUORIDE *POISON* from REYNOLDS
METAL CO.
kills our cattle * * * endangers
human health
CONTROLS MUST BE ENFORCED
THIS STATEMENT PAID FOR BY
PAUL R. MARTIN"

Martin admits the construction and maintenance of the sign, but denies that its language is defamatory of Reynolds, and affirmatively asserts that the lan-

guage contains "true statements of judicial determination" and most significantly, that the sign is "an exercise of rights guaranteed by the First Amendment of the Constitution of the United States and of the State of Oregon."

Reynolds seeks the recovery of resulting libel damage and, significantly for our purposes here, preliminary injunctive relief restraining the continued maintenance of the billboard sign and the exhibiting of its language to the public.

The Court heretofore, by order, referred Reynolds' application for the preliminary injunction to James M. Burns, a Special Master for this Court, to hear Reynolds' claim and submit to this Court his Special Master's findings and conclusions.

The Special Master has heard the parties, receiving as evidence affidavits and such portions of discovery deposition evidence and testimony theretofore taken by the Special Master under discovery order of this Court "which were specifically offered (by the parties) at the preliminary injunction hearing."

The Special Master heretofore made and filed herein his findings and conclusions and Reynolds has objected thereto as follows:

## FINDINGS OF FACT

I, II, III, IV, V and VI, which for our purposes here are adopted by the Court but not required to be set forth herein.

### VII.

There is no evidence on the record in this proceeding of a competent nature to justify a finding that such fluorides "endanger human health"; therefore such statement is unsubstantiated and untrue, EXCEPT INSOFAR AS IT CONSTITUTES A JUSTIFIABLE AND PRIVILEGED REFERENCE TO THE PERSONAL INJURY ACTIONS BROUGHT BY PLAINTIFFS AND THEIR DAUGHTER AGAINST DEFENDANT IN THIS COURT. (See Martin v. Reynolds Metal Co., D.C., 135 F.Supp.

379, and affirmed as Reynolds Metal Co. v. Yturbide, 9 Cir., 258 F.2d 321.)

Reynolds objects to that part of the finding which appears in capital letters.

### VIII.

FLUORIDE IS TOXIC AND THE FLUORIDE COMPOUNDS EMANATED FROM DEFENDANT'S PLANT ARE POISONOUS; INSOFAR AS SUCH COMPOUNDS SETTLE UPON PLAINTIFFS' LAND, THEY CONTAMINATE THE SAME; TO THAT EXTENT THE PORTIONS OF THE SIGN WHICH REFER TO POISONS AND CONTAMINATION ARE TRUE; the control system installed and maintained by Defendant is the most efficient and effective system anywhere in the United States and meets all applicable standards of the air pollution authorities of the State of Oregon; THE PORTION OF THE SIGN WHICH READS "CONTROLS MUST BE ENFORCED" CONSTITUTES NOTHING MORE THAN A MERE CALL TO ACTION BY PLAINTIFFS, WHO SEEM DETERMINED TO CIRCULATE THEIR RELIEFS AMONG THEIR FELLOW CITIZENS.

Reynolds objects to those portions of the finding that appear in capital letters.

## CONCLUSIONS OF LAW

### I.

That insofar as Defendant's counterclaim sounds in libel, the Defendant's remedy at law for damages is adequate, and issuance of an injunction would deprive Plaintiffs of their right to trial by jury and would be an unconstitutional denial of their right of free speech and press, hence, Defendant's application should be denied.

### II.

Insofar as Defendant's counterclaim is based upon trade libel or disparagement of property, there has been no showing whatsoever of special damages having been sustained by Defendant and in the absence of any proof of coercion or conspiracy, an injunction should not issue.

### III.

In either event, Defendant's delay in application for the preliminary injunction should bar its right to such relief at this time.

Reynolds objects to the whole of each of the three numbered conclusions, and further to the failure of the Special Master to include in his conclusions of law the following conclusion in accordance with page 16 of memorandum opinion of Special Master re defendant's application for preliminary injunction:

"Insofar as the wording on the sign accuses Defendant of poisoning livestock and poisoning humans, it is libelous *per se*."

The parties have submitted the findings and conclusions of the Special Master with Reynolds' objections thereto for adoption or rejection by the Court upon the record as made before the Special Master, together with counsels' briefs and memoranda.

The Special Master found (findings VI and VII) that these statements in Martin's sign:

a) "831 cattle killed in six years"; and

b) "kills our cattle—endanger human health"

were unsubstantiated and untrue.

Further, the Special Master advises, in his memorandum opinion filed in connection with his findings and conclusions, that although he was to conclude some of the language of Martin's sign to be libelous, *per se*, of Reynolds, nevertheless Reynolds

" * * * is not entitled to an injunction based upon its first count which sounds in libel. * * * see Krebiozen Research Foundation v. Beacon Press (Mass 1956) [334 Mass. 86] 134 N.E.2d 1. Anno. 47 ALR2d 715. While the traditional rule forbidding injunctive relief in libel cases has been severely criticized by the scholars, there is no doubt but that it continues in American courts in full force and effec-

tiveness. It has been the feeling of courts that injunctive relief in such cases:

(a) Infringes on the constitutional guarantees of freedom of speech and press, and thus establishes a system of potential judicial censorship;

(b) Deprives the enjoined person of right to trial by jury (though such deprivation here would be temporary, not permanent); and

(c) Dispenses with the necessity of the traditional prerequisite for equity jurisdiction—lack of an adequate remedy at law."

\*    \*    \*    \*    \*    \*

"Insofar as the wording on the sign accuses Defendant of poisoning livestock and poisoning humans, it is libelous *per se*. (See 53 CJS, Libel and Slander, page 124, § 73; ORS 164.710–720; ORS 163.300) In Oregon, in straight libel cases, where the language is libelous *per se*, there is no necessity of alleging or proving special damages, Peck v. Coos Bay Times 122 Or. [408] 418 [259 P. 307]. The burden of proving truth is upon the publisher of the allegedly libelous words. Still, none of these would serve to alter my firm conclusion that equity simply will not enjoin in a case involving 'straight' libel."

\*    \*    \*    \*    \*    \*

"Somewhat different principles are involved in connection with the second count of Defendant's counterclaim, which is characterized by Defendant as sounding in 'injurious falsehood'.

"Probably the best description of this tort is to be found in Prosser's article entitled 'Injurious Falsehood: The Basis of Liability', 59 Columbia Law Review 425:

'It is a tort which passes by many names. * * * Under whatever name, the essentials of the tort appear to be the same. It consists of

publication or communication to a third person, of false statements concerning the plaintiff, his property *or his business, which cause him pecuniary loss.* For this vague and ill defined complex, Sir John Salmond coined the term "injurious falsehood" which has been accepted by most legal writers, but which has as yet made little or no headway in the courts.'"

■■ In these diversity proceedings, the first query, (1) whether the language of the sign constitutes an actionable libel by plaintiffs, is to be answered under Oregon law per the Erie rule [Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188], and the second query, (2) whether the equitable remedy of injunction and restraint is available to defendant, is to be answered under the federal law. Guaranty Trust Co. of New York v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079, advises that

> "State law cannot define the remedies which a federal court must give simply because a federal court in diversity jurisdiction is available as an alternative tribunal to the State's courts. Contrariwise, a federal court may afford an equitable remedy for a substantive right recognized by a State even though a State court cannot give it."

1) Does the language of the sign libel Reynolds?

Martin's sign carries the message to the passing public of these 1), 2) and 3) asserted facts:

1) "831 Cattle Killed in past six years."

This statement, read in the context of the language of the sign, implies that fluoride from Reynolds' operation poisoned and killed 831 cattle. At the hearing before the Master *no medical evidence or testimony* connected the death of a single cow to fluoride poisoning.

2) "Fluoride *Poison* from Reynolds Metals Co. kills our cattle * *"

This statement is also false in the light of the medical testimony before the Master.

3) "Fluoride *Poison* from Reynolds Metals Co. * * * endangers human health"

The great weight of expert testimony showed this statement to be false and without basis in fact under present existing circumstances and controls.

■■ I find that the evidence before the Special Master and the Oregon law support his findings that the language of the billboard sign contains the false and untrue material as related, and I conclude that when the language of the sign is taken as a whole in its ordinary reasonable meaning and context, it constitutes an actionable libel *per se* of Reynolds. Peck v. Coos Bay Times, supra, at 418 of 122 Or., at 311 of 259 P., teaches:

> "Whether an article is libelous *per se* is a matter of law for the court to determine [citations omitted] and in so doing it must look to the general purport and intent of the article published and not to isolated sentences. Words are to be construed in their ordinary acceptance and meaning. The test is: What sense will be given to them by a reader of ordinary intelligence? Will the natural and proximate consequence be to injure the person about whom they have been published? Will such words tend to bring a person into public hatred, contempt or ridicule?"

And, also

> "If such [article] were actionable per se, it was not necessary to allege special damages * * *" (259 P. 310).

A reader of ordinary reasonable present-day understanding and intelligence would gather or infer from the three assertions or statements that Reynolds was knowingly conducting its operations so as to contaminate the surrounding countryside with fluoride poison, killing cattle and endangering human health. The inescapable effect of the suggestion or as--

sertion of these statements is to engender "public hatred" and "contempt" in the reader's mind for the named company so accused. It follows that the natural and probable result of such a publication is actual injury to a business interest of the company so accused—here Reynolds. The false and defamatory statements contained in the billboard sign place to the public the picture and image of Reynolds as a knowing killer of cattle and threat to human health and as such a callous and irresponsible member of the local society. To urge that such publicly viewed statements and accusations do not and has not *per se* injured a business interest of Reynolds is to ignore the realities of the present day contemporary highly competitive business world. Companies of local and national scale compete in the market place not only on the basis of product superiority, but also in terms of friendly corporate personalities and relationships and general good "corporate image."

2) Does federal law countenance equity to enjoin and restrain a libel which injures a business interest?

The majority American rule on this subject is probably still the same as it was when stated in Robert E. Hicks Corp. v. National Salesmen's Training Ass'n, 19 F.2d 963, 964 (7th Cir. 1927), to-wit:

"* * * that a court of equity will not enjoin the publication of a libel. The operation of the rule is not affected by the fact that the false statements may injure the plaintiff in his business or as to his property, in the absence of acts of conspiracy, intimidation, or coercion."

It should be noted at this point that there is a strong element of coercion in the public-sign activity of plaintiffs.

"Putting one in actual fear of loss of his property or of injury to his business, unless he submits to demands made upon him, is often no less potent in coercing than fear of violence to his person." Purvis v. Local No. 500, 214 Pa. 348, 63 A. 585, 587, 12 L.R.A.,N.S., 642 (1906).

One of Martin's admitted purposes in erecting the sign was to "compel Reynolds to install adequate controls" under standards set by Martin.

Even though as of today the majority American rule is as stated by Hicks, *supra,* nevertheless, when that rule or decision is presently recognized to be without logic, reason and justification in justice, fair dealings and equity, or any other bases for continued existence in modern commerce, it is a judicial necessity that the rule be cut down and discarded. Stubborn adherence to precedence for adherence's sake is jurisprudential lethargy. Failure to discard outmoded raiment in the exercise of discernment and enlightenment is a sin against judicial style and array. For exemplary examples of overthrow in the exercise of discernment and enlightenment, see the opinions of the Supreme Court of Oregon where it threw off outmoded shackles and recognized the actionable right of privacy, Hinish v. Meier & Frank Co., 166 Or. 482, 503, 113 P.2d 438, 446, 138 A.L.R. 1:

"We are called upon, as Mr. Justice Holmes says somewhere, 'to exercise the sovereign prerogative of choice' between the view that the courts for want of a precedent are impotent to grant redress for injury resulting from conduct which universal opinion in a state of civilized society would unhesitatingly condemn as indecent and outrageous, and the view that the common law, with its capacity for growth and expansion and its adaptability to the needs and requirements of changing conditions, contains within itself the resources of principle upon which relief in such a case can be founded. As the court said in Clark v. Associated Retail Credit Men, 70 App.D.C. 183, 105 F.2d 62, 64: 'We cannot evade this duty; for unless we establish a right in the plaintiff we establish a privilege or immunity in the defendant.'"

and recognized the realistic economic necessity in modern society to abolish

the unjust immunity from tort responsibility of charitable institutions in Hungerford v. Portland Sanitarium, Vol. 77 Oregon Advance Sheets, No. 3, p. 93, Or., 384 P.2d 1009, in the words

"   *   *   *   that expediency no longer justifies adherence to a dying doctrine."

It was in like vein of jurisprudential advancement that Black & Yates v. Mahogany Ass'n, 129 F.2d 227, 231, 148 A. L.R. 841 (3rd Cir. 1941) attacked the problem and told the world that:

"We are quite willing to repudiate the 'waning doctrine that equity will not restrain the trade libel'. We are further willing to do so directly and without hiding behind other equitable principles put forward in some of the cases. In so doing we may well repeat the words of a leading writer: 'What does it really matter whether old customers are induced not to carry out their obligations or new customers are persuaded by unfair means not to enter into contractual relations?' [Quoting Derenberg, Trademark Protection and Unfair Trading, p. 143]"

Also, in Paramount Pictures v. Leader Press, 106 F.2d 229, 231 (10th Cir. 1939), the Tenth Circuit stated:

"But a court of equity will extend appropriate protection to intangible as well as tangible property which forms a part of a lawful business. Equity does not draw any distinction between the two kinds of property in respect of protection against wrongful invasion."

and further:

"One without privilege so to do, has no right to issue and publish an untrue or deceptive statement of fact which has a disparaging effect upon the quality of another's property, under circumstances which would lead a reasonable person to foresee that it will have such effect. The making of such a statement in such circumstances is tortious."

As Dean Pound points out in his article "Equitable Relief against Defamation and Injuries to Personality," 29 Har.L. Rev. 640 (1916), most of the cases which hold that equity will not enjoin a libel, blindly harken back to some language in an old English decision which is no longer followed, indeed, if it ever was, in England.

■ In considering whether equity will enjoin trade libel (libel of a business or property interest), the better-reasoned opinions weigh two factors:

1) The adequacy or inadequacy of the remedy at law; and
2) The possible encroachment on free speech which might result from the injunction.

■■ In the instant case, the remedy at law is inadequate because: 1) The sign is a continuing tort causing irreparable injury to a property interest; and 2) the damages caused by the tortious conduct is difficult or impossible to measure. It should be recalled that the mere existence of a concurrent legal remedy does not bar equitable relief. Rather

"   *   *   *   the legal remedy must be equally effectual with the equitable remedy, as to all the rights of the complainant." Lewis v. Cocks, 23 Wall. 466, 90 U.S. 466, 468, 23 L. Ed. 70 (1874).

Unlike similar cases where equitable relief was denied, the court's injunction in this case would be both easy to carry out and easy to enforce—take down the sign, cease and desist until the claim is appropriately adjudicated.

Another argument often raised against enjoining libel is that to do so would deny the parties their right to a jury trial. This argument loses its force when it is acknowledged that Reynolds' application is addressed to equity for abatement— cease and desist, *pendente lite*, and not an action for a compensatory recovery— a jury trial awaits Martin on Reynolds' claim for damage for past alleged libel. The present danger of probable irrepa-

rable injury from future libel outweighs the claim of Martin's ability and capability to respond in adequate compensation at law.

■ The Supreme Court has held that the Constitution does not protect publications which are lewd, obscene, profane, or *merely libelous* from injunction. Chaplinsky v. New Hampshire, 315 U.S. 568, 571–572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942); however, where the publication is about something which is of public interest, then the party libeled must turn to law for his relief. Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931).

■ While, of course, under some circumstances and conditions uncontrolled airborne pollution can be a matter of public concern and interest (ORS Chapter 449), however, and even though the language of plaintiff's sign is beamed to the traveling public, the subject matter of the message thereof does not deal with a concern of public good and interest for these reasons:

> It is manifest that the construction and maintenance of Martin's sign is the outgrowth of a controversy between the two private parties—Martin v. Reynolds, and the subject matter of the private litigation is the tenor and theme of these proceedings;

> The dangers which the language of the sign calls to the attention of the public pertains only to the interest of the parties involved in the controversy;

> Martin's avowed purposes for the sign are private and personal to publicize his lawsuit to compel Reynolds to do as Martin demands. The only logical, rational conclusion from the language of the sign is that the language of the sign is libelous and tortious conduct not in the public interest or for the public interest.

> Such conduct is not a lawful exercise of free speech under the Federal Constitution and is indeed the very type of conduct which equity is well-equipped and ought to prohibit and protect against.

I conclude that

a) Reynolds' objection to the Special Master's finding number VII should be allowed.

b) The Special Master's finding number VIII be rejected by the Court.

c) Reynolds' objections to the Special Master's three numbered conclusions be allowed.

Accordingly, counsel for the defendant may submit proposed findings, conclusions and decree in conformity with the findings and conclusions of the Special Master as approved herein and in further conformance with this memorandum decision, on or before December 19; hearing of such proposals and plaintiff's objections thereto is set for settlement at 10:00 A.M. Monday, December 21, 1963.