NEW.NET, INC., Plaintiff,

v.

LAVASOFT, an entity of unknown form; Nicolas Stark Computing AB, an entity of unknown form, and Does 1–25, inclusive, Defendants.

No. CV 03–3180GAFCWX.

United States District Court, C.D. California.

Nov. 6, 2003.

Daniel Scott Schecter, David M. Simonds, Latham & Watkins, Los Angeles, CA, Ryan C. Squire, Stephen C. Chuck, Garrett & Tully, Pasadena, CA, for Plaintiff.

Louis J. Levy, Leventhal Senter and Lerman, Tobey B. Marzouk, Marzouk and Parry, Washington, DC, Thomas M. Norminton, Norminton & Wiita, Beverly Hills, CA, Henry D. Fetter, Doniger & Fetter, Los Angeles, CA, Richard J.J. Scarola, Thomas M. Norminton, Scarola Reavis & Parent, New York City, for Defendants.

## MEMORANDUM AND ORDER REGARDING MOTION FOR PRELIMINARY INJUNCTION

FEESS, District Judge.

## I.

## INTRODUCTION

This case presents a dispute between Plaintiff New.net, Inc., a company that downloads software to individual computers through the internet, often without the knowledge or request of the computer user, and Lavasoft, which produces and distributes software that locates programs like the one written by New.net, notifies computer users of their presence, and, if requested, removes these programs from the user's hard drive. Through this litigation, New.net, whose business ultimately "depends on its ability to distribute as

many copies of [its] software as possible," seeks an order that Lavasoft cease distributing its software or delete New.net's software from its target list. New.net complains that Lavasoft has: (1) unfairly targeted and has mislabeled New.net's software; (2) inaccurately associated New.net's software with "the worst of the worst" internet downloaders; and (3) recommended to computer users that New.net's program be uninstalled. This activity, according to New.net, constitutes false advertising, unfair competition, common law trade libel, and tortious interference with prospective economic advantage. In the present motion, New.net seeks a preliminary injunction barring the distribution of Lavasoft's program unless it deletes or changes what it says about New.net's software.

Lavasoft contends that its distribution of its software constitutes speech and that New.net seeks an impermissible prior restraint, even if New.net's allegations were found to be true. Lavasoft, however, claims that its program does not mislabel New.net's software, that its inclusion of the New.net software on its target list is not unreasonable, and that it does not recommend deletion of the New.net software, but rather leaves that decision to the computer user. Lavasoft also notes that it distributes its program, a version of which can be obtained without cost, only to individuals who request it because of their desire to identify programs that have found their way onto users' computers without their knowledge or consent. Thus, from Lavasoft's perspective, the case impacts on the right of computer users to control what resides on their hard drives and the uses to which their computers are put.

The Court concludes that New.net's motion is not meritorious. New.net brings this suit, and the present application for preliminary injunction, to protect its ability to surreptitiously download its New.net software by silencing a company whose computer program, *at the request of a computer owner,* calls attention to New-DotNet's presence on the user's hard drive. Correctly understood, the contest in this case is between computer users, who acquire software precisely to determine what programs they may have unsuspectingly loaded onto their hard drives, and New.net, which apparently needs the ability to deliver its program to as many unwitting users as possible to further its business plan. Accordingly, New.net's case requires the Court to determine whether it may grant the requested injunction without running afoul of the First Amendment prohibition against prior restraints. The Court concludes that, whether or not the speech is viewed as less-protected "commercial speech," it falls within the scope of First Amendment protections because it addresses a matter of public interest. Under these circumstances, the Court's ruling in this preliminary proceeding may not turn on whether the statements in dispute are true or false, although, as discussed in this memorandum, the Court finds that New.net presents no persuasive evidence that any of Lavasoft's statements are false. Thus, on First Amendment principles, the motion for preliminary injunction must be **DENIED**.

## II.

### PERSONAL JURISDICTION

■ Before turning to the merits of this case, the Court must address the issue of personal jurisdiction and proper service of summons on Defendants, who are aliens. Defendants have answered Plaintiff's complaint, but have asserted affirmative defenses as to personal jurisdiction and sufficiency of service. (Answer at 6). Defendants' opposition to the pres-

ent motion also seeks to preserve the defenses (opp. at 1), but at the same time responds to the merits of the motion. Further, Defendants have filed several papers with the Court in addition to the opposition, including a joint stipulation to extend time to answer, an ex parte request to move the hearing on the preliminary injunction, and a joint scheduling conference report.

As it began its review of this motion, the Court noted that Defendants had raised the issue of personal jurisdiction, and therefore issued an order to the parties to present argument on that issue to permit the Court to address its jurisdiction before expending substantial judicial resources on the substance of the pending motion.[1] The parties, however, ignored the Court's order and provided no response. Thereafter, Defendants appeared at the hearing on this motion, argued its merits, and never once complained that the Court lacked personal jurisdiction over the dispute.

Under the circumstances now before the Court, the question of whether Defendants have waived the defense is presented. Ordinarily, one preserves a defense by timely raising it. *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1318 (9th Cir.1998). However, having raising the defense at an early stage of the proceedings does not mean that a party cannot thereafter waive it. As the *Peterson* court noted, "[m]ost defenses, including the defense of lack of personal jurisdiction, may be waived as a result of the course of conduct pursued by a party during litigation." *Peterson*, 140 F.3d at 1318. The *Peterson* court provided an example:

> [I]f a defendant were to engage in "sandbagging" by raising the issue of personal jurisdiction on a motion to dismiss, deliberately refraining from pursu-

ing it any further when his motion is denied in the hopes of receiving a favorable disposition on the merits, and then raising the issue again on appeal only if he were unhappy with the district court's ultimate decision, then we would not hesitate to find that the defendant had waived any right to pursue the defense.

*Id.; see also Rice v. Nova Biomedical Corp.*, 38 F.3d 909, 915 (7th Cir.1994) (personal jurisdiction defense deemed waived despite its timely assertion as a result of defendant's defense on the merits and failure to renew the jurisdictional issue); *Continental Bank, N.A. v. Meyer*, 10 F.3d 1293, 1297 (7th Cir.1993) (district court's finding of waiver upheld by circuit where defendants had fully participated in litigation of the merits without objection); *see also Yeldell v. Tutt*, 913 F.2d 533, 539 (8th Cir.1990).

Here Defendants were given an opportunity to litigate the personal jurisdiction issues before the Court addressed the merits of the pending motion. Defendants simply refused to do so. Furthermore, since they first raised the issue, they have participated actively in the proceedings to date, including the appearance at, and participation in, oral argument regarding the preliminary injunction while remaining silent as to the issue of personal jurisdiction. Moreover, they have noted their intention to file a motion to dismiss Plaintiff's state law claims under California's anti-SLAPP provision. Under all of these circumstances, the Court concludes that Defendants have waived their right to assert the Court's alleged lack of personal jurisdiction as a defense in this case. The Court proceeds to the merits of New.net's motion for preliminary injunction.

---

1. On this point, the Court notes that the Ninth Circuit has vacated preliminary injunctions on finding that the trial court lacked personal jurisdiction. *E.g., Paccar Int'l, Inc. v. Commercial Bank of Kuwait, S.A.K.*, 757 F.2d 1058 (9th Cir.1985).

## II.

## FACTUAL BACKGROUND

### A. THE PARTIES

#### 1. New.net

Plaintiff New.net describes itself as a "leading domain name registry and provider of domain name extensions." (Compl. at 2). New.net apparently generates revenue through the sale of domain names in nonstandard format such as .free and .shop. These are not "true" domains akin to .edu, .gov, .org, or .com under existing internet naming conventions, so each of New.net's nonstandard names must be linked to a site using a traditional extension such as .com. Thus the nonstandard domain name "Costumes.shop," might be linked to "Costumes.shop.cexx.org." (Opp.Exh. G). However, without special software, either loaded onto a user's computer or incorporated into the software of an internet service provider, an internet user who types a nonstandard domain name into his or her browser will not be able to locate the website. New.net deals with this problem by providing software, "NewDotNet," that recognizes the nonstandard extension and connects the user to the a web site without requiring the user to know and enter the site's "true" name.[2]

Because New.net generates its revenue through the sale of these nonstandard domain names, its ultimate success depends on maximizing the value of these names by generating internet traffic to these sites. That is, it needs to enable increasing numbers of end users—most of whom have never sought to do business with New.net—to access New.net customers' websites. This in turn requires the installation of NewDotNet on computers in the hands of the general consuming public. New.net concedes that its "success depends on its ability to distribute as many copies of the New.net Software as possible." (Mot. at 9 Sheehy Decl. ¶ 10). How that is done is at the heart of the present dispute.

#### 2. Lavasoft

■ Defendant Lavasoft/Nicolas Stark Computing, AB describes itself as "a public information service" which started as a "project to bring to public notice the fact that unwanted software applications were being downloaded to personal computers without user knowledge or consent." (Opp. at 3). Lavasoft has developed a program, Ad–Aware, which is available for free on the Internet, with enhanced versions for sale by Lavasoft. (Akerlund Decl. ¶ 8).[3] Ad–Aware is such an incredibly popular program—Lavasoft has distributed more than 30 million copies of it— that in the week of August 17, 2003 alone, computer users downloaded 270,000 copies of the software. (Amabile Decl. ¶¶ 3, 4). Ad–Aware's basic function is to detect spe-

---

2. Exhibit B to the Simonds Declaration expands on this point:"Our software allows users to access websites using New.net's descriptive domain names (a naming solution that was launched in response to the somewhat flawed process that has controlled Internet naming to date). We have invested countless hours in the development and testing of our software as well as millions of dollars for distribution."

3. Although Akerlund's declaration does not state that the averments are made on personal

knowledge, the Court may, in its discretion, accept hearsay for purposes of deciding whether to issue the preliminary injunction. *See Flynt Distrib. Co., Inc. v. Harvey,* 734 F.2d 1389, 1394 (9th Cir.1984) ("The urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult to obtain affidavits from persons who would be competent to testify at trial. The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial.").

cific programs and alert end users to their presence, asking users whether they wish to delete the identified programs. Apparently the primary target of Ad-aware is so-called "trackware" or "spyware," which is highly unpopular software that tracks users' web-surfing habits and profiles their shopping, sending the data to third parties without user's knowledge or permission. (Sheehy Decl. Exh. B). Lavasoft advertises that Ad–Aware "detect[s] and remove[s] the worst that the Internet and shareware/freeware have to offer." (*Id.* at 17).

## B. AD-AWARE'S LIST INCLUDES NEWDOTNET

### 1. What Ad–Aware Says About New-DotNet

The present dispute centers on the fact that Ad–Aware identifies New.net's program, NewDotNet, when used to scan a computer for software pests. In particular, if New.net software is on a computer when the freely available version of Ad–Aware is activated,[4] a text box appears reporting New.net files, along with whatever other files Ad–Aware has identified for potential removal. (*See, e.g.,* Akerlund Decl. Exh. S). Once the report appears, if the user clicks on the New.net name, a dialogue box appears and states:

Vendor: New.Net
Category: Misc
Object Type: LSP
Location: *[a file location appears here]*
Last Activity:
Risk Level: High
Comment: Layered Service Provider
Description *[an icon that looks like a bug appears next to this heading]* **Installs a layered service and namespace provider to extend your browser to understand exotic domain names. Installs unsolicited (bundled with popular third party applications). Can cause connectivity issues/loss of connectivity.**
Comment: **[a link to Microsoft support appears here]**
(*Id.* Exh. T).[5] There is no description or explanation of the "Misc." category in Ad–Aware. (Amabile Decl. ¶ 9).[6]

### 2. Ad–Aware's Identification of New-DotNet as a Dataminer

There is conflicting evidence that one or more versions of Ad–Aware lists certain New.net files as "dataminer" files in the Category heading, instead of as "Misc." files. (*Id.* Exhs. C & D). Data mining has been loosely defined as "collecting and

---

4. The two versions of Ad–Aware that are sold over the Internet scan for the same list of software as the free version. (Akerlund Decl. ¶ 8). The enhanced versions additionally "alert the user on an ongoing basis whether New.Net and many other programs are about to be downloaded ... and gives [*sic*] the user the opportunity to block or accept the download." (*Id.*). In specific, when New.net begins to download, a dialogue box appears, with the heading: "Ad-watch Alarm Event" and a red bug and "Warning!" below. (Amabile Decl. Exh. F). Ad–Aware then explains, "[a]n attempt to alter a protected object has been detected." (*Id.*). New.net's name appears a few lines down as "Value: New.net Startup." (*Id.*). The dialogue box then states in red lettering: "Please choose how to proceed," and "Accept" and "Block" buttons fol-

low. (*Id.*). Though New.net claims that several versions of Ad–Aware prevent end users from accessing New.net's website, Lavasoft states that in actual fact, the enhanced versions only interrupt those who type a New.net URL into their browsers, allowing the users the option whether to go to the site or not. (Akerlund Decl. n. 2). Apparently, Ad–Aware does not block access altogether. (*Id.*).

5. Footnote 4 in the Reply states without citation that this dialogue box does not exist.

6. New.net contends that it is the only program listed in the "Misc." category, (Amabile Decl. ¶ 9), but Lavasoft shows that many other programs are also listed as "Misc." (Akerlund Decl. ¶ 25).

storing information about end users' Internet browsing activities and using that information to target end users . . . ." (*Id.* ¶ 8). Thus, a dataminer is a type of "spyware" or "trackware." New.net states that Lavasoft has labeled its program as a dataminer "on and off," (reply at 2), but it notes that as of September 8, Lavasoft stopped doing so. (*Id.* at 3; Supp. Amabile Decl. ¶¶ 4, 5). Lavasoft takes no stance on whether New.net is or is not a dataminer and vigorously asserts that only a single, early version of Ad–Aware labeled any New.net files as dataminers. (Akerlund Decl. ¶ 26). Lavasoft adds that the dataminer label was unintended, and "as soon as Lavasoft learned that the new release of Ad-aware 6.0 had those various errors, it fixed them." (*Id.*). Again, New.net concedes that as of September 8, Lavasoft stopped targeting New.net as a dataminer, but it argues this recent change is a bit too self-serving to be credited. (Reply at 4; Amabile Supp. Decl. ¶ 4).

7. New.net cannot truly be unclear as to Lavasoft's position. In a response to New.net's counsel before this suit was filed, Lavasoft explained its position in detail in a letter that included the following passage:

Ad-aware is a demand only scanning utility that is designed to provide the user with control over what is installed on their computers. This includes, but is not limited to, software components that are installed without the user's knowledge, consent, or which cannot be uninstalled using standard removal procedures, and also includes applications that our users have requested a simple removal solution for. Many of these applications are intrusive, potential security and/or privacy risks, and can cause serious difficulties if they are not removed properly, but we also stress that all detections are not necessarily harmful.

The cornerstone of our personal and corporate philosophy is to give the user choice, choice which most of the vendors in our database do not extend. At no time is an Ad-aware user required or forced to remove anything detected. Our software simply detects content and then presents this infor-

### 3. Why Ad–Aware Lists NewDotNet
#### a. Surreptitious Downloads

Though New.net claims to be puzzled as to why Lavasoft might wish to scan for New.net software, Lavasoft provides two explanations.[7] First, New.net is installed on private computers with little or no notice to their owners. Lavasoft explains, and New .net acknowledges, that New.net is typically introduced onto home computers through "bundling," a process by which an individual who intentionally requests and downloads certain desired software actually gets a bundle of other software that was not sought by the user. (*Id.* ¶ 10; Amabile Decl. Exh. M at 46, 47). Moreover, as even New.net tacitly admits, its software is sometimes introduced to users' computers *without any notice or consent.* (*See id.;* Supp. Amabile Decl. ¶ 12 (asserting that "virtually all" downloads are with consent)). For example, New.net may be silently downloaded with software called "Freewire" without disclosure. (Akerlund Decl. ¶ 12; *id.* Exh. B).[8] Other times,

mation to the user, who must then decide what to remove and what NOT to remove.

. . . . .

We also do not label NewDotNet as Spyware, nor do we tell the user to remove NewDotNet. Ad-aware has to be initialized by the user, and the same user must decide what (if anything) to remove. Lavasoft does not require, encourage, or suggest that any detected content be removed; rather the user is solely responsible for deciding what Ad-aware will or will not remove. (Simonds Decl. Exh. I).

8. New.net states that this statement in Akerlund's declaration is hearsay. As noted above, at note 3, the Court may nevertheless consider it. New.net's experts also confirm that New.net software is downloaded surreptitiously and sometimes without notice, (*e.g.,* Amabile Decl. Exh. H at 34).

New.net notes in its reply that it contractually requires all of its bundling partners to provide notification of New.net's presence. Thus, Freewire's failure to do so is explained as a "rogue" act. (Reply at 9–10; Sheehy Supp. Decl. ¶¶ 11–14).

New.net's presence is disclosed deep within complicated user agreements that do not allow users to opt out of downloading the bundled conglomeration. (*Id.* Exh. D).[9]

Despite this evidence, New.net vigorously asserts that, except for possibly a very few instances of downloads through "rogue" bundling partners, its software is only downloaded to those computer users who request it and want what it has to offer. In support, they offer a PricewaterhouseCoopers report that supposedly confirms this fact. (Sheehy Decl., ¶ 5 & Exh. A). However, just a few moments of reflection suggests that, if this assertion were true, there would be no reason for this lawsuit. If a computer user requested NewDotNet, and knew it had been downloaded to his computer, then Ad–Aware's notification of that fact to the user would hardly come as a surprise. Such notification would merely advise the user of what he or she already knows—that the program NewDotNet resides on his or her hard drive. Because Ad–Aware does not remove any program without direction from the user, the user who had requested the program in the first place would have no reason to delete the program merely because Ad–Aware noted its presence. Ad–Aware, therefore, could not possibly pose a threat to New.net unless New.net's software was downloaded without the informed consent of the computer user, in which case Ad–Aware's disclosure of its presence would indeed come as a surprise.

Under the latter scenario, one would hardly be shocked if the user chose to remove the unrequested program from his computer.

The logic is supported by the evidence. New.net has offered in support of its motion the Declaration of David Simonds, which presents, as exhibits, the correspondence between the parties leading up to this lawsuit. Included in that correspondence are attachments from internet sites on which problems associated with NewDotNet are discussed. These attachments confirm that, in the internet privacy community, New.net's surreptitious downloads are a topic of discussion. The following are two examples:

*Cexx.org: Foistware: New Net, Inc. (NewDotNet) DLL*

Infection Method:

The NewDotNet software is surreptitiously bundled with unrelated software in typical Foistware fashion. This software consists of a browser "plug-in" DLL ..., which is placed in the user's Windows folder. The file is normally placed in C:*Windows*(C:*WinNT* for NT users) and run silently at start-up (via RundII32) by a Run key placed in the Windows registry.

It is asserted, but unverified that the NewDotNet component is not substantially disclosed in the install agreements (if at all). This observation is due to the many mails we have received from customers who found New.Net on their sys-

---

9. New.net's counsel, in a letter dated May 7, 2003, acknowledged that NewDotNet is included in some bundles that do not permit an opt out of the NewDotNet download. He writes, "While iMesh and Grokster both currently include NewDotNet, among other software, as a mandatory installation along with their respective applications, users are still given a clear choice not to download iMesh or Grokster at all if they do not wish to accept any of the mandatory installations, including

NewDotNet." (Simonds Decl. Exh. J, at 39). In short, New.net includes its software with certain programs that people want, and, unless the consumer is willing to give up what he or she wants, the consumer must take the NewDotNet software. This is apparently what passes for a consensual download in the world of "foistware." The Court also notes that, in the case of iMesh, the existence of New.net's software is disclosed 11 pages into a dense, incomprehensible user's agreement.

tems and had no idea how it got there. It is asserted by a large number of readers that they don't know how this got on their systems.

(Simonds Decl. Exhibit I at 23–24).

### Doxdesk.com: find Unsolicited Commercial Software

This site describes New.net's software as follows: "It is not overtly harmful in intent, but counts as Unsolicited Commercial Software as it installs behind your back and its purpose is to generate revenue for its manufacturer." This site explains that the software is distributed with RealOne, AudioGalaxy, KaZaA, iMesh, Grokster, BearShare, Babylon and Radlight. It creates security issues because it "downloads and silently executes arbitrary code from its controlling server, as an update feature." (*Id.* at 24–25, *see also id.* at 34 (discussion of New.net as "'foistware'—products that install unwanted extras on your system without your permission or even knowledge. Two culprits, NewDotNet and Webhancer, are currently making the rounds.")).

Thus, despite New.net's protests to the contrary, the Court has no question that New.net uses downloading methods that, at the very least, do not call attention to the fact that the user is getting software in which he or she may have no interest. Ad–Aware would pose no threat otherwise.

### b. System Problems

The second reason that Ad–Aware identifies New.net's software is that it may cause serious problems on a computer on which it is installed, including loss of connectivity with the Internet. (Akerlund Decl. ¶ 15). These problems are identified by Microsoft and various software reviewers. They include errors that occur when attempting to connect to the Internet

when New.net is installed, (opp.Exh. I), errors that occur when installing Active Sync, a third party software program, when New.net is installed, (*id.* Exh. J), and conflicts between various other software and New.net. (*Id.* Exhs. N, O, P). PestPatrol, a Lavasoft competitor, states that "[a]t least some versions of [New.net] have been known to crash IE [Internet Explorer] regularly. Also if you delete the program without uninstalling it properly, or in some circumstances, upgrade your operating system, NewDotNet will stop all network connectivity." (*Id.* Exh. Q).

Much of the focus of New.net's motion centers on this final point, the fact that, when removed improperly, its software may totally and perhaps irredeemably sever connectivity. New.net charges that it has invested substantial sums to create a safe and effective method of uninstalling its software and that Ad–Aware's method of removing New.net has been improper and destructive. (Amabile Decl. ¶¶ 14–17, Exhs. G & H). New.net also provides evidence that the resulting imposition on users has dealt severe blows to New.net's reputation. (*Id.* ¶ 21). Ad–Aware does not clearly deny that its method may at one time have been flawed, but asserts that the "current, and only, version distributed by Lavasoft today has never been subject of such a claim." (*Id.* ¶ 30). Indeed, New.net does not establish that any currently distributed version of Ad–Aware causes connectivity problems.[10]

### c. The "Misc." Label

Regardless of the reasons for Ad–Aware's inclusion of NewDotNet on its target list, New.net argues that by labeling New.net as "Misc.," Lavasoft leads consumers to believe that New.net is harmful. New.net craws this conclusion because La-

---

**10.** New.net makes oblique references to files that Ad–Aware still damages upon removing New.net, (Reply at 15; Amabile Supp. Decl. ¶ 33), while Lavasoft indicates that it can detect no such error. (Opp. 12 n. 7).

vasoft primarily markets Ad–Aware as an anti-spyware solution. (Sheehy Decl. Exh. B). Although the principal focus of Ad–Aware is spyware, which is noted in Lavasoft's marketing of the program, New.net repeatedly exaggerates this point, stating without basis or citation that "[t]he *only* reason users download Ad–Aware is to find and remove trackware or spyware . . . ." (Reply at 6) (emphasis added). Thus, since New.net contends, on the basis of evidence from two privacy software experts that NewDotNet should not be considered spyware or trackware, Lavasoft's target list should not contain NewDotNet. (Amabile Decl. Exhs. G & H).[11] The conclusion is not supported by the premise, as there is no evidence to support the contention that Ad–Aware is downloaded by users only to find and remove trackware or spyware. Indeed, since Ad–Aware in fact identifies a number of different types of unwanted downloads (*see* Sheehy Decl. Exh. B at 18), one would reasonably infer that those who use it are not limited to those interested only in finding trackware and spyware.

### d. Ad–Aware's Purported Focus on Unsophisticated Users and Its Unfair Association of New.net With Other Downloaders

In support of its basic argument that Ad–Aware unfairly targets its software, New.net contends that Ad–Aware is not a "demand only" product and that it markets its software to unsophisticated computer users. This argument was vigorously presented at the hearing on this motion, which echoed the position taken by New.net's counsel in the following passage from a letter to Lavasoft:

Lavasoft's Ad-aware is *not* a 'demand only' detection and removal tool that provides 'user[s] a choice . . . for deciding what Ad-aware will or will not remove.' In fact, Lavasoft does not give average users any meaningful choice to remove software. Lavasoft markets its product to technically unsophisticated consumers. In most cases, the average user of Lavasoft's software cannot differentiate between the various programs Lavasoft identifies, let alone components of programs that have been targeted by Ad-aware.

(Simonds Decl. Exh. J). New.net's assertions are notable in a number of respects.

(1) Lavasoft is, without question, software which is obtained only upon demand of computer users (Akerlund Decl. ¶ 6; Simonds Decl. Exh. I);

(2) Lavasoft gives users a choice as to whether or not to remove software identified by Ad–Aware. In fact, the choice given by Ad–Aware is far more "meaningful" than that given to unsuspecting downloaders of NewDotNet (Amabile Decl. ¶ 12, Exh. H at 34);

(3) New.net provides no evidence in support of its claim that users of Ad–Aware "cannot differentiate between the various programs Lavasoft identifies."

(4) New.net apparently fails to recognize the irony in its assertion that Lavasoft users are "technically unsophisticated" (a proposition again not supported by evidence). Assuming that New.net has correctly described these users, they are the same people who New.net claims have, with knowledge and consent, agreed that New.net should be down-

---

11. These expert statements are not sworn, but are articles apparently published originally on the Internet. Lavasoft calls the credibility of New.net's two experts into doubt, noting that both were terminated by Lavasoft. (Akerlund Decl. ¶ 14). New.net also cites a report by PricewaterhouseCoopers, which New.net commissioned. (Sheehy Decl. Exh. A). This report indicates, among other things, that New.net does not engage in conduct typically considered datamining.

loaded to their computers. The Court can only conclude that New.net believes it should be able, on the one hand, to take advantage of technically unsophisticated consumers by bundling its software in packages whose content is difficult to discern, and, on the other hand, to stifle anyone who calls attention to this fact because their message will not be properly understood. In short, New.net obtains no advantage in this litigation by denigrating the sophistication of computer users who, with the assistance of Ad–Aware, discover the presence of NewDotNet on their computer hard drives.[12]

New.net has also complained that, by merely including NewDotNet on its target list, Lavasoft has unfairly associated the program with the "worst of the worst" on the internet. The contention is a stretch because neither Lavasoft in its marketing, nor its Ad–Aware software in its disclosures, ever says any such thing about NewDotNet. Furthermore, as noted above, NewDotNet is specifically described as a layered service provider, and is placed in a miscellaneous category. Nonetheless, because some promotional materials regarding Lavasoft describe it as a leader in "anti-Trackware solutions," and because Lavasoft permits the detection and removal of "the worst that the Internet and shareware/freeware have to offer," New.net argues that anything listed in Ad–Aware unfairly associates NewDotNet with these undesirable programs. (*E.g.,* Sheehy Decl., Exh. B, at 15, 17).

The argument ignores the terms used by Ad–Aware in its description of NewDotNet, and draws inferences regarding what users may and may not believe without presenting any useful evidence on the

subject. Moreover, New.net ignores its own conduct, which itself contributes to the conclusions that consumers might draw regarding the nature of NewDotNet. As an example, even in one of the articles New.net submits in support of its motion, the author notes that "NN still **bundles with trash and questionable applications.** In fact a few may have serious legal problems to contend with soon." (Amabile Decl., Exh. G, at 28) (emphasis added). The same author later reiterates that New.net has a number of problems including "bundling with so many crappy applications." (*Id.* at 29). Thus, New.net can hardly complain of any negative associations created by Ad–Aware, when its own conduct creates associations that are less than desirable.

## C. New.net Seeks An Injunction Against Lavasoft's Distribution of Ad–Aware

Despite the factual problems with its case, New.net now asks the Court, through a preliminary injunction, to require Lavasoft to remove the New.net program from its targeted list and to take other steps to cure the alleged harm done to New.net's business. Because Ad–Aware constitutes speech on an issue of public importance, the Court concludes that the First Amendment precludes the issuance of the injunction.

## IV.

## PLAINTIFF SEEKS AN IMPERMISSIBLE PRIOR RESTRAINT

### A. AD-AWARE IS SPEECH

Although the parties do not dispute that Ad–Aware is a form of speech by Defendants, the Court finds analysis of this issue

---

12. The Court doubts that New.net's label in fact applies to users of Ad–Aware, since these users were savvy enough in the first instance to suspect that their computers might contain programs that the users didn't want, and they were sufficiently knowledgeable and resourceful to seek out and find a way of confirming (or not) their suspicions.

to be a logical starting point for resolving the present matter.

After two hundred years of interpreting the First Amendment, the Supreme Court (and numerous scholars) have yet to settle on a single, universal definition for the term "speech." Its meaning is more elusive and fluid than might at first be assumed, but it can be said with certainty that the term is broadly inclusive. The Supreme Court has explained that the First Amendment embraces "[a]ll ideas having even the slightest redeeming social importance," including the " 'advancement of truth, science, morality, and arts in general.' " *Roth v. United States,* 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) (quoting 1 Journals of the Continental Congress 108 (1774)). Thus, various courts have applied First Amendment principles in reviewing restrictions on the dissemination of such varied items as technical scientific information, scientific research, and instructions for engaging in a dangerous sex acts. *Universal City Studios, Inc. v. Corley,* 273 F.3d 429, 446–48 (2d Cir.2001) (collecting cases); *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (applying First Amendment protection to expression on a license plate). Indeed, even forms of wordless conduct may find First Amendment protection when they convey an expressive message. *Compare Tinker v. Des Moines Community Sch. Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (wearing politically significant armbands protected); *with Sunset Amusement Co. v. Bd. of Police Comm'rs of the City of Los Angeles,* 7 Cal.3d 64, 73–75, 101 Cal.Rptr. 768, 496 P.2d 840 (1972) (operating roller skating rink not protected); *MacDonald v. Newsome,* 437 F.Supp. 796, 798 (E.D.N.C.1977) (surfing not protected).

"[A] narrow, succinctly articulable message is not a condition of constitutional protection;" rather, the Supreme Court has found that the touchstone for identifying "speech" is whether there are "expressions conveying an intent to convey a particularized message," and, "in the surrounding circumstances[,] the likelihood was great that the message would be understood by those who viewed it." *Spence v. Washington,* 418 U.S. 405, 410–11, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974). When a message clears this threshold, it does not lose protection even if it is purely dry, factual information. *See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 761–62, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); *Corley,* 273 F.3d at 446 ("Even dry information, devoid of advocacy, political relevance, or artistic expression, has been accorded First Amendment protection."); *Bernstein v. U.S. Dep't of State,* 922 F.Supp. 1426, 1435 (N.D.Cal.1996) ("Instructions, do-it-yourself manuals, [and] recipes" are all "speech"). In keeping with these principles, the high Court in *Virginia State Bd. of Pharmacy,* struck down prohibitions against dissemination of pricing information for prescription drugs. The Court found that release of such information was protected by the First Amendment even if a given pharmacist "does not wish to editorialize on any subject, cultural, philosophical, or political... [and] does not wish to report any particularly newsworthy fact, or to make generalized observations even about commercial matters." *Virginia State Bd. of Pharmacy,* 425 U.S. 748, 761, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976).

In this case, Lavasoft's identification of New.Net for consumers conveys factual information sought out by millions of users. The message clearly conveyed is: "New.net is on your computer," or, taking the facts in the light most advantageous to Defendants, "New.net is on your computer, and we recommend that you delete it." Lavasoft conveys this information with

particularity, in words, and the heart of New.Net's complaint is that users understand the message clearly. Under *Spence v. Washington,* 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974), this is enough to consider it speech.

This conclusion finds support in several analogous cases. *See Isuzu Motors Ltd. v. Consumers Union of U.S., Inc.,* 12 F.Supp.2d 1035 (C.D.Cal.1998) (concluding that safety review of Isuzu Troopers in *Consumer Reports,* and other print, broadcast, and Internet publications was speech); *Bihari v. Gross,* 119 F.Supp.2d 309 (S.D.N.Y.2000) (finding that website informing public of difficulties with plaintiff's interior decorating business was speech); *Taucher v. Born,* 53 F.Supp.2d 464 (D.D.C.1999) (holding that a regulation aimed at preventing dissemination of fraudulent investment advice constituted an impermissible prior restraint of speech rather than a valid regulation of a profession in that it barred conveyance of investment "advice and recommendations" to customers). Because the message conveyed by Lavasoft's program is speech, any effort to stifle it must comport with those principles enunciated in First Amendment jurisprudence.

## B. THE FIRST AMENDMENT PROHIBITS PRIOR RESTRAINTS

▮ Freedom from government censorship is a core guarantee of the First Amendment. *Bd. of Trs. of State Univ. of N.Y. v. Fox,* 492 U.S. 469, 481, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989). This guarantee is so jealousy guarded that courts have, since the foundation of this country, been loathe to restrain speech, even if its content is alleged to be remarkably harmful. *See Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 570, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976) (rejecting prior restraint issued to guarantee a criminal defendant's Sixth Amendment right to a fair trial); *New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (declining to enjoin newspapers from publishing the "Pentagon Papers," despite government's claim that doing so could threaten national security). For more than thirty years, it has been established that allegations of falsity are insufficient to warrant prior restraint. Indeed, in a case involving an injunction against distributing leaflets criticizing respondent's business, the Supreme Court held:

> It is elementary, of course, that in a case of this kind the courts do not concern themselves with the truth or validity of the publication. Under *Near v. Minnesota,* the injunction, so far as it imposes prior restraint on speech and publication, constitutes an impermissible restraint on First Amendment rights .... No prior decisions support the claim that the interest of an individual in being free from public criticism of his business practices in pamphlets or leaflets warrants use of the injunctive power of a court.

*Org. for a Better Austin,* 402 U.S. at 418–19, 91 S.Ct. 1575 (internal citations omitted). *See also Am. Malting Co. v. Keitel,* 209 F. 351, 354 (2d Cir.1913) ("Equity will not restrain by injunction the threatened publication of a libel, as such, however great the injury to property may be. This is the universal rule in the United States and was formerly the rule in England."); *Procter & Gamble Co. v. Bankers Trust Co.,* 78 F.3d 219, 225 (6th Cir.1996) (refusing to enjoin publication of trade secrets improperly obtained in violation of a protective order, noting, "[t]he private litigants' interest in protecting their vanity or their commercial self-interest simply does not qualify as grounds for imposing a prior restraint."). In short, a preliminary injunction barring speech "bear[s] a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan,*

372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963).

### C. WHETHER AD-AWARE IS COMMERCIAL SPEECH IS NOT CONTROLLING

The First Amendment offers no protection for false or deceptive commercial speech. *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 563, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). However, truthful commercial speech does enjoy meaningful First Amendment protection. *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978); *Fox*, 492 U.S. at 478, 109 S.Ct. 3028. However, the question of the *actual* truth or falsity of Lavasoft's speech is not appropriate on this motion for *preliminary* injunctive relief. "A preliminary injunction is not a preliminary adjudication on the merits, but a device for preserving the status quo and preventing the irreparable loss of rights before judgment." *Textile Unlimited, Inc. v. A. BMH & Co.*, 240 F.3d 781, 786 (9th Cir.2001). The Supreme Court has focused on this as a particular basis for proscribing prior restraints, observing: "[t]he special vice of a prior restraint is that communication will be suppressed . . . before an adequate determination that it is unprotected by the First Amendment." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 390, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973). In other words, "[t]he danger of a prior restraint, as opposed to [an] ex post . . . action, is precisely that making predictions ex ante as to what restrictions on speech will ultimately be found permissible is hazardous and may chill protected speech." *Latino Officers Ass'n, New York, Inc. v. City of New York*, 196 F.3d 458, 465 (2d Cir.1999). By contrast, "once a jury has determined that a certain statement is libelous, it is not a prior restraint for the court to enjoin the defendant from repeating that statement." *Kramer v. Thompson*, 947 F.2d 666, 676 (3d Cir. 1991).[13]

Even if the Court were permitted to enjoin purely commercial speech upon a showing that it was false, no such showing has been made in this case. New.net's reply insists that Lavasoft admits to false speech by admitting that New.net is not a dataminer and that the dataminer label Ad–Aware once used was false. On this basis, New.net asserts that an injunction must issue. However, Lavasoft does *not* admit that New.net is not a dataminer; it takes no position on the issue in its opposition. While it does admit that it did not intend to label New.net files as dataminers, this does not amount to proof that the label was actually false. And in any event, the evidence before the Court fails to es-

---

13. New.net ignores the distinction between expressions already found to be untrue and those whose validity has yet to be adjudicated. For example, it relies on *Vondran v. McLinn*, No. C 95–20296 RPA, 1995 U.S. Dist. LEXIS 21974, 1995 WL 415153 (July 5, 1995), but that case clearly states: "An injunction enjoining speech cannot issue . . . unless . . . the trier of fact has made a finding that the statements sought to be enjoined are libelous or the statements were found to be libelous in a prior proceeding." *Parris v.Super. Ct.*, 109 Cal.App.4th 285, 135 Cal.Rptr.2d 90 (2003), also cited in the reply, struck down a prior restraint, noting "[b]road-based assertions that a proposed informational notice is 'unfair,' contains some inaccurate statements or is presented in a misleading form are simply insufficient bases for imposition of judicial limitations on protected speech in the form of a prior restraint." *Id.* at 300, 135 Cal.Rptr.2d 90. Finally, *Wilson v.Super. Ct.*, 13 Cal.3d 652, 119 Cal.Rptr. 468, 532 P.2d 116 (1975) *also* found an order to be an impermissible prior restraint. It did state that an injunction "restraining speech may issue in some circumstances to protect private right," *id.* at 662, 119 Cal.Rptr. 468, 532 P.2d 116, but did not mention what "circumstances" those were. Other case law makes clear that such circumstances include instances in which an utterance has already been found untruthful.

tablish that the present version of Ad–Aware places such label on NewDotNet.

**D. THE APPROPRIATE ISSUE FOR THE COURT TO DECIDE IS WHETHER LAVASOFT'S SPEECH RELATES TO A MATTER OF PUBLIC—AS OPPOSED TO EXCLUSIVELY PRIVATE—INTEREST**

■ Though New.net unduly focuses on whether Lavasoft's speech is *commercial,* it does touch on the key issue to be determined in this matter—whether Lavasoft's speech concerns a purely "private" matter for which the prior restraint doctrine supposedly has less currency. Because Lavasoft's speech addresses a matter of legitimate public concern and not merely a private dispute, the Court concludes that the private/public distinction provides little help to New.net.

*1. Ad–Aware Is Fully Protected Speech*

■ "Whether ... speech addresses a matter of public concern must be determined by [the expression's] content, form, and context ... as revealed by the whole record." *Connick v. Myers,* 461 U.S. 138, 147–148, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 761, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985). In applying this test, the *Dun & Bradstreet* Court found the issuance of a false credit report not to be a topic of public concern. The basis for this decision was that, "[i]t was speech solely in the individual interest of the speaker and its specific business audience;" that the speech has been found to be "wholly false and clearly damaging to the victim's business reputation;" and that "the credit report was made available to only five subscribers, who, under the terms of the subscription agreement, could not disseminate it further ...." *Id.* at 762, 105 S.Ct. 2939. This combination convinced the Court that "[t]here is simply no credible argument that this type of credit reporting requires special protection to en-

sure that 'debate on public issues [will] be uninhibited, robust, and wide-open.'" *Id.* (citing *N.Y. Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)).

This case is different for several reasons. First, Lavasoft's speech touches on issues of public concern regarding various aspects of the internet. It must be emphasized that literally millions of individuals have sought out Lavasoft's software—basically its advice—about how to ensure their privacy and security on the Internet. Lavasoft's Ad–Aware program is freely available to these individuals. As even New.net's Director of Customer Support has stated, Ad–Aware is among the "most trusted and popular anti-trackware software applications distributed to the public," (Amabile Decl. ¶ 3), and through Ad–Aware, Lavasoft is a major player in the "the Internet privacy movement." (Sheehy Supp. Decl. ¶ 15). Thus, New.net can hardly argue that the speech involved in this case is of limited or purely private interest.

Furthermore, this issue is clearly related to a growing public concern, one which even New.net admits has become a "movement." New.net's own evidence includes an Internet article stating: "Heated arguments have been popping up on message boards everywhere between people who say NewDotNet is spyware and those who say it is not." (Amabile Decl. Exh. H 33). Another commentator describes the current litigation and "reaction" on "privacy-oriented message boards;" the author then speculates about the impact of this decision on "other anti-spyware companies currently targeting New.Net," noting that they "will ... be watching." (Opp. at Exh. E). This, of course, suggests that the impact of the Court's decision may have a chilling effect on the "Internet privacy

movement" that New.net's President describes.

Exhibit G to the opposition and Exhibit G to Plaintiff's Amabile Declaration contain similar commentary. In the article labeled Exhibit G to the Amabile Declaration, which refutes some criticisms of New.net, the author states, "However, I don't let NN off the hook that easily. They are typical of many corporations and their philosophies these days. Get it while you can, anyway you can, don't worry about what anyone thinks .... I find this detestible ...." (Amabile Decl. Exh. G). This sort of commentary illustrates the scope of the public debate over companies like New.net and how they do business over the internet.

Second, due to the procedural posture of this matter, unlike that in *Dun & Bradstreet* for example, there is no final finding of falsity to justify preliminary relief. Moreover, case law adds strong support to the conclusion that Plaintiff's requested injunction is constitutionally infirm. *Isuzu Motors Ltd. v. Consumers Union of U.S., Inc.,* 12 F.Supp.2d 1035 (C.D.Cal.1998) represents one very persuasive example. In that case, Isuzu sought an injunction to bar release in various print, broadcast, and Internet publications of an allegedly false report regarding the safety of Isuzu Troopers. Isuzu brought claims for defamation, product disparagement, unlawful, unfair and fraudulent business practices under California's Business & Professions Code, intentional interference with business relations, and declaratory relief based on ongoing criticism of its Trooper in such publications as *Consumer Reports. Id.* at 1039. The defendant brought a 12(b)(6) asserting that Isuzu's request for an injunction against disseminating or publishing false, defamatory or disparaging information about Isuzu or the Trooper constituted an impermissible prior restraint. Without explicitly finding that the defendant's speech concerned a matter of public interest, Judge Paez agreed with its position, stating: "[s]uch an injunction would necessarily precede an adequate determination that a particular statement by defendant was false, defamatory or disparaging." *Id.* at 1049. Judge Paez dismissed Isuzu's claim for relief under § 17200 with prejudice to the extent that it sought relief "beyond enjoining defendant from making specific statements determined to be unprotected by the First Amendment," and he noted that it would be necessary for a jury to determine which of the defendant's statements would be so unprotected. *Id.*

Similarly, in *Bihari v. Gross,* 119 F.Supp.2d 309 (S.D.N.Y.2000), the plaintiff sought to enjoin defendant from publishing defamatory statements about her or her interior design business on websites, contending that the statements sued on constituted common law libel. *Id.* at 311. In that case, the defendant obtained multiple websites featuring plaintiff's name (e.g., yourname.com) and then posted accusations of fraud and deceit stemming from what he perceived was a bad interior decorating job. The court found that the "websites concern the business practices and alleged fraud of a well-known interior designer. Such speech is 'arguably within the sphere of legitimate public concern,' which imbues the speech with a heavy presumption of constitutional protection" under New York law. *Id.* at 325. The court then found that the requested injunctive relief was an improper prior restraint.

The Court finds these cases persuasive. Because the disputed content of the Ad–Aware software addresses a subject of public importance and debate, it is entitled to the full protection of those First Amendment cases that bar prior restraints.

### 2. The Private/Public Dispute Distinction

#### a. Precedent Acknowledging the Distinction

Because New.net relies heavily on those cases that suggest a lower level of protection for allegedly private speech, the Court will address those cases, although, in the end, the Court questions the vitality of those cases, in circumstances where the plaintiff seeks a prior restraint on speech.

New.net's moving papers cite *Leonardini v. Shell Oil Co.*, 216 Cal.App.3d 547, 264 Cal.Rptr. 883 (1989), for the proposition that injunctive relief is appropriate in trade libel cases involving a private dispute. (Mot. at 20). *Leonardini* indeed says that injunctive relief is "clearly" available in "ordinary case involving private disputes." *Id.* at 579, 264 Cal.Rptr. 883. However, this is dictum, as the *Leonardini* court found that the issue in the case before it was one of public concern. *Id.* at 577–79, 264 Cal.Rptr. 883. In support of its dictum, *Leonardini* cited *Sys. Operations v. Scientific Games Dev. Corp.*, 555 F.2d 1131 (3d Cir.1977) and *Martin v. Reynolds Metals Co.*, 224 F.Supp. 978 (D.C.Or.1963). However, the appellate court in *Sys. Operations* reversed the grant of a preliminary injunction against product disparagement on procedural grounds and explicitly declined to decide whether the requested injunction violated the prior restraint doctrine. *Id.* at 1146.

*Martin*, a district court decision, was a case in which the trial judge granted a preliminary injunction requiring a farmer, who erected a billboard accusing a nearby alumina reduction plant of contaminating his ranch with fluoride poisons, to remove the billboard pending the outcome of his litigation with Reynolds. Following an evidentiary hearing in which a special master concluded that the statement on the billboard was false, the trial judge issued the injunction and concluded that "[t]he dangers which the language of the sign calls to the attention of the public pertains only to the interest of the parties involved in the controversy; Martin's avowed purposes for the sign are private and personal to publicize his lawsuit to compel Reynolds to do as Martin demands." *Id.* at 985. On this basis, the court granted the preliminary injunction. While the result supports New.net's claim that a public/private speech distinction exists, the decision contains only a brief discussion of First Amendment principles.

Although Plaintiff does not cite it, its position may also rest on Supreme Court precedent indicating that "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection," while protections afforded to speech on "matters of purely private concern ... are less stringent." *Dun & Bradstreet*, 472 U.S. at 760, 105 S.Ct. 2939. There is also more direct support (that Plaintiff does not cite) for the notion that the prior restraint doctrine in particular does not apply with full force to private disputes. California's Supreme Court has stated that governing jurisprudence "leave[s] no doubt that the truth or falsity of a statement on *a public issue* is irrelevant to the question whether it should be repressed in advance of publication... The concept that a statement *on a public issue* may be suppressed because it is believed by a court to be untrue is entirely inconsistent with constitutional guarantees ...." *Wilson v.Super. Ct.*, 13 Cal.3d 652, 658, 659, 119 Cal.Rptr. 468, 532 P.2d 116 (1975) (emphasis added). Also, in passing dicta, several California cases cite *Magill Bros. v. Bldg. Serv. etc. Union*, 20 Cal.2d 506, 127 P.2d 542 (1942) for the proposition that an injunction restraining speech may issue in some circumstances to protect private rights. *See, e.g., Wilson*, 13 Cal.3d at 662, 119 Cal.Rptr. 468, 532 P.2d 116. In *Magill*, the court concluded

that it was error to deny injunctive relief against picketing involving false speech. Thus, the Court recognizes that case law draws some distinction between public and private speech, and the relative protection afforded each.

### b. No Controlling Precedent Authorizes Prior Restraint of Private Speech

None of the authority discussed above clearly supports the proposition that prior restraints may be imposed on speech involving "private" disputes. As noted, *Leonardini* states the proposition only in dicta, as does *Wilson*, while *Sys. Operations v. Scientific Games Dev. Corp.* never reached the issue. *Martin*—the case between the rancher and the alumina reduction plant—involves a relatively unusual fact situation. The accuracy of the billboard statement had been litigated in a special proceeding and found to be false, and it had been found to be directed to the specific litigation between the parties as opposed to a general statement regarding the operation of Reynolds' facility. Even so, California's Appellate Court has noted that *Martin* predated key Supreme Court precedent regarding prior restraint, and stated, "[t]o the extent Martin is inconsistent with these decisions, Martin cannot be considered good law." *Paradise Hills Assoc. v. Procel*, 235 Cal.App.3d 1528, 1541, 1 Cal.Rptr.2d 514 (1991). It is also worth noting that *Martin* itself acknowledged that "[t]he majority American rule on this subject is ... that a court of equity will not enjoin the publication of a libel. The operation of the rule is not affected by the fact that the false statements may injure the plaintiff in his business or as to his property, in the absence of acts of conspiracy, intimidation, or coercion." *Martin*, 224 F.Supp. at 983 (citation omitted).

Likewise *Magill*—the picketing case—is not persuasive for several reasons. First, like *Martin*, it was decided prior to at least two precedential Supreme Court pri-

or restraint cases. Second, the matter had been fully tried in order to determine falsity, and the trial court had ruled that the picketer's message was actually false. *Magill*, 20 Cal.2d at 507, 127 P.2d 542. The *Magill* majority placed great weight on this, and on the fact that the injunction at issue aimed at halting *false picketing*— i.e., physical conduct suggesting that there was a labor dispute afoot where there was none. *Id.* at 508–09, 127 P.2d 542. The court differentiated the situation from one solely involving speech, stating that in this case it is "not the utterance of false statements which is sought to be enjoined, but the conduct of picketing in an unlawful manner." *Id.* at 509, 127 P.2d 542. The decision is also noteworthy because the majority never discussed prior restraint, and it certainly did not rest on the notion that the injunction was proper because a mere "private" dispute was involved. Thus, the decision turned on the speech/conduct distinction that has been a hallmark of Supreme Court First Amendment jurisprudence. E.g., *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 580, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988), *quoting NLRB v. Retail Store Employees*, 447 U.S. 607, 619, 100 S.Ct. 2372, 65 L.Ed.2d 377 (1980) (Stevens, J., concurring).

Finally, as for Supreme Court precedent stating that private speech enjoys limited First Amendment protection, it is important to note that even speech on purely private topics receives some First Amendment protections. *See Dun & Bradstreet*, 472 U.S. at 760, 105 S.Ct. 2939; *United Mine Workers v. Illinois State Bar Ass'n*, 389 U.S. 217, 223, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967). As the Court stated in *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), "an employee's false criticism of his employer on grounds not of public concern may be

cause for his discharge but would be entitled to the same protection in a libel action accorded an identical statement made by a man on the street." *Id.* at 147, 103 S.Ct. 1684.

### E. BECAUSE THE REQUESTED RELIEF CONSTITUTES A PRIOR RESTRAINT, THE COURT NEED NOT ASSESS THE TYPICAL FACTORS FOR PRELIMINARY INJUNCTIVE RELIEF

The First Amendment's protections, including the prior restraint doctrine, are usually discussed in relation to libel or defamation causes of action, but "although such limitations happen to have arisen in defamation actions, they do not concern matters peculiar to such actions but broadly protect free-expression and free-press values." *Blatty v. New York Times Co.*, 42 Cal.3d 1033, 1043, 232 Cal.Rptr. 542, 728 P.2d 1177 (1986). Indeed, as even New.net's own authority explains, "all causes of action having as their gravamen the alleged injurious falsehood of a statement must satisfy the requirements of the First Amendment." *Leonardini,* 216 Cal. App.3d at 576, 264 Cal.Rptr. 883 (internal marks omitted). Certainly, the label a savvy plaintiff puts on its claims should not determine the scope of First Amendment protections afforded to the relevant expression. *See Blatty,* 42 Cal.3d at 1042–43, 232 Cal.Rptr. 542, 728 P.2d 1177; *Sullivan,* 376 U.S. at 269, 84 S.Ct. 710 (noting that no cause of action "can claim ... talismanic immunity from constitutional limitations.").

In *J.K. Harris & Co., LLC v. Kassel,* 253 F.Supp.2d 1120 (N.D.Cal.2003), the court had initially enjoined the defendants from issuing allegedly false criticisms of plaintiff's tax representation service on their website. On a motion for reconsideration, however, the court acknowledged that it had overlooked the prior restraint doctrine in favor of applying the usual standard for preliminary injunctive relief. The court admitted that "whether any of the content on Defendants' web sites may be enjoined as false and misleading is separate and distinct from the question of whether Plaintiff is likely to succeed on its [Lanham Act] claim ...." *Id.* at 1127. The court went on to confirm its earlier conclusion that "plaintiff has shown a serious question going to the merits of whether Defendants have violated section 43 of the Lanham Act by publishing false representations of fact misleading to the public," *id.* at 1129, but it then decided to lift the preliminary injunction on the ground that "enjoining these statements prior to an adjudication of their truth or falsity would suppress arguably protected speech ...." *Id.*

Indeed, in a different procedural posture—on a 12(b)(6)—Judge Paez flatly dismissed claims for injunctive relief under California's Business and Profession's Code § 17200 with prejudice on finding that the requested relief would constitute a prior restraint. *Isuzu Motors Ltd.,* 12 F.Supp.2d at 1049. These cases show that neither federal, nor California state claims are immune from the First Amendment's mandate; rather, the gravamen of the cause of action controls.

In this case, each of New.net's claims relates to what Lavasoft says about New.net software. That is, each cause of action is based on "label[ing]" or "identify[ing]" or "mischaracteriz[ing]" NewDotNet. (Compl.¶¶ 22, 31, 40, 45). Moreover, the proposed injunction would proscribe distribution of Ad–Aware only if it "labels, characterizes, or otherwise suggests or represents to customers that the New.net Software is," among other things, "similar in nature to other software products targeted by Ad–Aware." (Prop. Pl at ¶ 1(a)). The proposed injunction would also directly bar Lavasoft, its agents, and employees in any and all circumstances from "disparaging" New.

net's software. (*Id.* ¶ 1(c)). Further, the order would require that Lavasoft post prominently on its internet homepage: "All references to New.net's software have been removed from the Ad-aware software pursuant to an order from the United States District Court for the Central District of California." (*Id.* ¶ 2).

The apparent and direct focus on speech in this proposal reveals the true nature of Plaintiff's entire case. For that reason, the application for a preliminary injunction is **DENIED**.

IT IS SO ORDERED.